# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEASTAR HOLDINGS, INC., *et al.*[1] | Case No. 18-__10039__ (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF MATTHEW FOSTER IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Matthew Foster, hereby declare as follows:

1. I am the Chief Restructuring Officer of SeaStar Holdings, Inc. ("SHI"), Seaborne Virgin Islands, Inc., ("SVI") and Seaborne Puerto Rico, LLC ("SPR") (collectively, the "Company"), the above-captioned debtors and debtors-in-possession (the "Debtors"). I joined the Company's management team as its Chief Restructuring Officer on November 6, 2017. In this capacity, I have become and am familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "First Day Pleadings"). I submit this declaration (the "Declaration") in support of the Debtors' Chapter 11 Cases and the First Day Pleadings.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: SeaStar Holdings, Inc. (0418), Seaborne Virgin Islands, Inc. (5458), and Seaborne Puerto Rico, LLC (3572). The Debtors' corporate headquarters and the mailing address is World Plaza Building, 9th Floor, 268 Munoz Rivera Avenue, San Juan, Puerto Rico 00918.

{1182.001-W0049902.}

3. Except as otherwise indicated herein, all statements set forth in this Declaration are based upon (i) my personal knowledge as the Chief Restructuring Officer, (ii) information supplied to me by other members of the Company's management team or the Debtors' professionals, (iii) my review of relevant documents, and/or (iv) my experience and knowledge of the Debtors' operations and financial affairs. If called upon to testify, I could and would testify to the facts set forth in this Declaration. I am authorized by the Debtors to submit this Declaration.

4. Part I of this Declaration describes the Debtors' businesses, Part II describes the circumstances giving rise to the commencement of these Chapter 11 Cases, Part III describes the Debtors' proposed course for these Chapter 11 Cases, and Part IV sets forth certain facts in support of the First Day Pleadings.

## I.

## OVERVIEW OF THE DEBTORS' BUSINESSES

### Business Operations

5. The Company, doing business as Seaborne Airlines, is a U.S. Certificated Air Carrier operating under Part 121 of the Federal Aviation Regulations and has been operating for more than twenty-five years. In 1992, the Company began flying cruise line passengers in Alaska with sightseeing tours. A year later, the Company moved to warmer weather and began flying seaplanes between St. Croix and St. Thomas in the U.S. Virgin Islands. In 2013, the Company capitalized on American Eagle's withdrawal of its regional Caribbean operations by adding land-based aircraft (the Saabs (defined below)) and ramping up its operations. In 2014, the Company moved its headquarters from the U.S. Virgin Islands to Puerto Rico and ultimately became the preeminent regional airline for the Caribbean.

6.  The Company serves local passengers within the Caribbean and connecting traffic to numerous locations within or outside the United States through code share or interline arrangements with multiple airline partners. Prior to the 2017 Hurricanes (defined below), the Company operated approximately 1,700 monthly flights to twelve (12) Caribbean destinations transporting approximately 300,000 passengers each year. The following shows the Company's current route profile:



7.  As of the Petition Date, the Company has 194 full-time employees and 68 part-time employees. One hundred and eighty-five (185) of the full-time and part-time employees are based out of the Debtors' offices in San Juan, Puerto Rico with the remaining full-time and part-time employees located in cites in the U.S. Virgin Islands and British Virgin Islands. The Company has no unionized employees and is not party to any collective bargaining agreements.

*The Company's Fleet*

8.      The Company's fleet consists of seven (7) thirty-four (34) seat Saab 3408Bs (the "Saabs") and one fifteen (15) seat Twin Otter Seaplane (the "Seaplane"), which enable the Company to service smaller airports and facilities in the Caribbean. Five of the Saabs are leased from Volant SVI Leasing, LLC, successor in interest to Montecito New York, LLC ("Volant Leasing"), an affiliate of Versa (defined below), and two (2) of the Saabs are leased from Wells Fargo Bank Northwest, N.A, as trustee for Jetstream Aviation Capital, LLC ("Jetstream"). The Seaplane is leased from Kenn Borek Air Ltd. In addition, the company leases four CT7-9B engines from Aviation Inventory Resource (AIR) that are attached to the Saabs.

9.      On or about December 20, 2017, Jetstream provided its notice of termination of the Jetstream leases. On January 7, 2018, Jetstream and the Company entered into a new short-term lease for two (2) of the Saabs. On January 5, 2018, Volant Leasing terminated its leases with the Company and the parties entered into new short-term leases for the Saabs.

10.     The majority of the Company's inter-island flights are via the Saab fleet, with its principal hub in Puerto Rico. Virtually all of the connecting United States traffic generated through its code share or interline agreements with other airlines travels through San Juan. The Seaplane serves as the primary air transportation between St. Croix and St. Thomas in the U.S. Virgin Islands.

*Interline and Code Share Agreements*

11.     Following the withdrawal of American Eagle from the Caribbean in 2013, the Company entered into its first code share agreement with American Airlines. Since then, the Company also has entered into code share agreements with jetBlue Airways, Delta Air Lines and Vieques Air Link (collectively, the "Code Share Agreements"). Generally speaking, pursuant to

the Code Share Agreements, the Company and its code share partner airlines agree to reciprocal ticketing, baggage handling, marketing and other services to permit passengers to book a single ticket to their ultimate Caribbean destinations.

12. The Company also has interline agreements with American Airlines, United Airlines, Delta, jetBlue, Cape Air, Condor, and Hahn Air (collectively, the "Interline Agreements"). Generally speaking, pursuant to the Interline Agreements, the two airlines agree to reciprocal ticketing and baggage handling terms to facilitate more convenient connections to passengers' ultimate Caribbean destinations.

**Corporate Structure**

13. SHI is a privately-held corporation formed under the laws of Delaware in 2013. SHI directly owns SVI, an entity organized under the laws of the United States Virgin Island and SPR, an entity organized under the laws of Puerto Rico. SVI is the operating entity, doing business as Seaborne Airlines.

**2016 Marketing Process and Capital Structure**

14. The Company broadly expanded its operations in 2013 after American Eagle ended its regional Caribbean operations. This expansion came at a significant cost, resulting in the Company losing nearly $17 million on an operating basis from 2013 through 2015. In early 2016, the Company began exploring its strategic options to obtain additional debt or equity financing, the sale of its assets or otherwise restructure its debt. The Company, on its own, reached out to numerous strategic investors and obtained two letters of interest. In addition, on May 16, 2016, the Company engaged Seabury Corporate Advisors, LLC ("Seabury"), the preeminent aviation consulting firm, to assist it in selling its assets or obtaining additional capital investments (the "2016 Process"). Through the 2016 Process, Seabury reached out to over

twenty (20) potential strategic and financial investors, resulting in six (6) non-disclosure agreements with interested parties. In the summer of 2016, the Company engaged in negotiations with one of the interested parties but no agreement was reached. In March 2017, Versa Capital Fund ("Versa") provided an additional letter of intent.

15. Versa's letter of intent included exclusive negotiations with Montecito New York, LLC ("Montecito"), the Company's then majority equity holder and senior secured lender pursuant to that certain Loan and Security Agreement, dated as of April 25, 2016 (the "Loan Agreement"). On June 14, 2017, Montecito assigned all of its right, title and interest in the Loan Agreement and all related guarantees and similar documents to Volant SVI Funding, LLC ("Volant Funding"), a Versa affiliate. In addition, between June 14th and June 20th, 2017 Montecito assigned all of its right, title and interest in five (5) then-current aircraft lease agreements (the "Assigned Leases") to Volant Leasing, another Versa affiliate. Likewise, Montecito sold the underlying aircraft associated with the Assigned Leases to Volant Leasing. In addition, Montecito assigned to Volant Leasing all of its right, title and interest in and to all rent, maintenance fees and other amounts due and owing by SVI pursuant to six (6) terminated aircraft lease agreements (the "Non-Assigned Leases," together with Assigned Leases, the "Volant Leases"). Versa, through its affiliate Volant SVI, Inc., also purchased approximately eighty percent (80%) of SHI's outstanding common equity and one hundred percent (100%) of its preferred equity from Montecito and other shareholders. It is my understanding that Versa's acquisition of SHI's equity, the Loan Agreement and the Volant Leases was part of an overall strategy to merge the Company with a complementary Versa portfolio company—Silver Airways, LLC ("Silver"), which is headquartered in Florida and offers flights within Florida and to the Bahamas, also exclusively using a Saab fleet.

*Secured Debt*

16.     As noted above, the Company is party to the Loan Agreement, which was assigned to Volant Funding in June 2017. As of September 15, 2017, the outstanding principal and interest obligations under the Loan Agreement were not less than $4,049,412. On September 15, 2017, SVI and SPR entered into an Amended and Restated Loan Agreement with Volant Funding, which was guaranteed by SHI (the "Amended Loan Agreement"). Among other things, the Amended Loan Agreement authorized additional borrowings in an aggregate principal amount not to exceed $2,000,000 (the "New Loan"), subject to the terms and conditions in the Amended Loan Agreement. On September 15, 2017, SVI and SPR also executed that certain Amended and Restated Promissory Note (the "Amended Note") in favor of Volant Funding evidencing the obligations under the Amended Loan Agreement. Under the Amended Loan Agreement, the Amended Note and all related documents (collectively, the "Loan Documents"), Volant Lending asserts liens on and security interests in substantially all of the Company's assets, including cash (the "Cash Collateral").

17.     In connection with the Amended Loan Agreement and Amended Note, SVI, SPR and Volant Funding entered into that certain Amendment and Forbearance Agreement dated September 15, 2017 (the "Forbearance Agreement") in which, among other things (a) the Company acknowledged its outstanding obligations under the Loan Agreement and its numerous defaults thereunder and (b) Volant Funding agreed to forbear from exercising any of its remedies through November 30, 2017 or the date the Company defaulted under the Amended Loan Agreement, other than the then-current defaults. Pursuant to the Forbearance Agreement, the Company also released any claims, causes of action or defenses against Volant Funding relating

to the Loan Agreement or the Cash Collateral. The current amount outstanding under the Loan Documents, including outstanding principal and interest is not less than $6,004,815.

18. On September 15, 2017, SVI entered into a Forbearance Agreement related to the Volant Leases (the "Lease Forbearance"). Pursuant to the Lease Forbearance, Volant Leasing agreed to not exercise its rights and remedies under the Volant Leases due to SVI's failure to pay the outstanding obligations (totaling approximately $5.07 million) through November 30, 2017 or a date that SVI defaulted under the Lease Forbearance. In connection with the Lease Forbearance, SVI released all claims, causes of action and defenses against Volant Leasing in connection with the Volant Leases.

19. In addition, on September 15, 2017, SVI and SPR entered into a Secured Promissory Note with Volant Leasing (the "Lease Note"), securing all of the obligations under the Volant Leases, which was guaranteed by SHI. The Lease Note bears interest at eleven percent (11%) per annum and is paid in kind on a monthly basis. The Company's obligations under the Lease Note are secured by Cash Collateral. The current outstanding amount, including interest and fees, under the Lease Note is not less than $5,542,566.26.

20. On March 23, 2017, SVI and Evertec Group, LLC ("Evertec"), the Company's credit card processor, entered into an Amended and Restated Merchant Agreement (the "Merchant Agreement"). In connection with the Merchant Agreement, SVI agreed to increase its reserves under the agreement and enter a Reserve Account Control Agreement (the "Control Agreement"). The Control Agreement, executed on August 7, 2017 among FirstBank Puerto Rico, Evertec and SVI, grants Evertec a lien on and security interest in the Reserve Account (as defined therein).

*Unsecured Debt*

21. As of the Petition Date, the Company estimates that its unsecured debt aggregates approximately $11.2 million, consisting of trade debt, airline lease and maintenance obligations, and governmental or regulatory obligations relating to, among other things, passenger facility charges, airport landing fees, United States customs fees for the inspection of baggage and cargo, Transportation Security Administration security fees, and immigration and health inspection fees.

*Equity*

22. SHI has sixteen (16) common equity holders and one (1) preferred equity holder. As set forth above, Volant SVI, Inc. holds approximately eighty percent (80%) of SHI's common stock and all of its preferred stock. The Company's board of directors consists of Kamal Advani, Jeffrey B. Armbrister and Paul Halpern, each of whom is employed by Versa or one of its affiliated entities and Wayne R. Walker.

## II.

## EVENTS LEADING TO THESE CHAPTER 11 CASES

23. The second week of September 2017 brought destruction and devastation to much of the Caribbean when Hurricane Irma struck. Several of the Company's destinations were almost completely destroyed and many others suffered significant damage. Only a week later, Hurricane Maria hit Puerto Rico, St. Croix and Dominica, leaving more destruction in its path. To date, much of the Caribbean is struggling to recover from these natural disasters; Puerto Rico, in particular, continues to suffer from significant structural damage, power outages and supply shortages occasioned by the one-two punch of Hurricanes Irma and Maria (collectively, the "2017 Hurricanes"). As has been widely reported, the 2017 Hurricanes were two of the most

destructive storms the Caribbean has faced and the islands, which are dependent on tourism, face a long road to recovery.

24. The 2017 Hurricanes initially halted substantially all of the Company's flight operations. A few weeks following the 2017 Hurricanes, the Company assisted in relief efforts by flying stranded tourists or residents off of the devastated islands. Following Hurricane Irma, the Company operated relief flights to St. Maarten, St. Thomas and Tortola. Following Hurricane Maria, the Company added additional flights departing from Puerto Rico to provide necessary capacity for passengers leaving the island.

25. The 2017 Hurricanes have resulted in a crippling decline in the Company's revenue and caused the Company to fall significantly behind on its obligations, including payments on the Volant Leases, rent, and obligations to its other vendors and service providers. The failure to pay these obligations triggered numerous defaults under the Loan Agreement, which the Company acknowledged in the Forbearance Agreement and Lease Forbearance, which expired by their terms on November 30, 2017. Notwithstanding these difficulties and the expiration of the forbearance agreements, neither Volant Funding nor Volant Leasing has exercised available remedies.

26. In October 2017, the Company retained Landis Rath & Cobb LLP as restructuring counsel and, shortly thereafter, engaged myself, as CRO, and my firm to provide restructuring advice. The Company has continued to consider its alternatives, working in good faith with Volant Funding to resolve the Company's cash-flow needs despite the negative effects of the 2017 Hurricanes on the Company's operations. With the expiration of the Forbearance Agreement and Lease Forbearance on November 30, 2017, however, all of the obligations under

the Loan Documents and Volant Leases are due and owing and the Company has no present ability to satisfy them.

27. Ultimately, following a rigorous evaluation of all available options, the Company determined that filing for Chapter 11 protection, obtaining postpetition financing and pursuing an orderly sale of its assets in a controlled, court-supervised environment is the best available option for it and its stakeholders. The Company believes that the Chapter 11 process, including the proposed sale of its assets pursuant to the highest and otherwise best bid (as described below), will be seamless for its passengers, trading partners and vendors, result in minimal disruption to its operations, allow the company to strengthen its financial structure, and position it for significant future growth.

**Postpetition Facility and 363 Sale**

28. In light of the foregoing, the continuing deterioration of its cash position and its present lack of realistic stand-alone restructuring options, the Company, in the exercise of its reasonable business judgment, determined that the most effective way to maximize value for the benefit of its stakeholders was to seek bankruptcy protection in order to sell substantially all of its assets (the "Assets") through a sale pursuant to Bankruptcy Code section 363 (the "Sale"). In connection therewith, on December 12, 2017, the Company re-engaged Seabury (which ran the 2016 Process) to again market its assets. Seabury has begun preparing its marketing materials and will market the Debtors' assets postpetition.

29. In order to ensure that it has sufficient funds to maintain the stability of its business and its going concern value, the Company has obtained authority to utilize Cash Collateral and to borrow approximately $10.19 million, including $4.19 million in new money (the "Postpetition Facility") from Volant Funding as set forth in the DIP Motion (as defined

below). In the exercise of its business judgment, the Company has determined that the Postpetition Facility is the best, and only, financing available to it and that the Postpetition Facility will provide it with the liquidity it requires to operate in these Chapter 11 Cases.

30. SB Acquisition 2017, Inc. has agreed to serve as the Company's stalking horse purchaser (the "Stalking Horse Bidder") in connection with the Sale. In connection therewith, the Company and the Stalking Horse Bidder entered into that certain Asset Purchase Agreement, dated January 7, 2018 (as amended, supplemented, or modified from time to time, the "Asset Purchase Agreement"), a true and correct copy of which is attached to the Debtors' Sale Motion (as defined below). The Stalking Horse Bidder has agreed to purchase substantially all of the Debtors' assets, subject to higher or otherwise better bids, for an aggregate purchase price of $5,000,000 consisting of (a) a release of certain liabilities of the Company under the Amended Note and Postpetition Facility; (b) the assumption of certain liabilities, including certain liabilities related to assumed and assigned executory contracts and unexpired leases, and certain ordinary course of business liabilities; and (c) $100,000 cash. Additionally, the Stalking Horse Bidder presently intends to offer employment to substantially all of the Company's current employees with employment commencing as of, and only upon, the closing of the Sale.

31. Because the Company is pursuing a competitive auction for its assets, the Sale process will seek additional bids that will ensure the Company obtains the highest and otherwise best offer for the Company's stakeholders. The Company believes, in the exercise of its business judgment, that the Sale structure will foster an open and competitive process and provide the best option to maximize value for all of its stakeholders. Indeed, given that the Company has limited cash and no realistic financing option other than the Postpetition Facility (which itself depends on the Sale process moving forward as proposed), the only alternative to the Sale would be

conversion to Chapter 7 and liquidation. In the Company's view, liquidation would be exceedingly value destructive, as the Company would immediately lose its going concern value, eliminate jobs, and be required to try to monetize assets that have little or no value outside of their use by the Company as a going concern.

### III.

### PROPOSED COURSE OF THE CHAPTER 11 CASES

32. The Debtors intend to pursue the Sale in Chapter 11 in order to avoid deterioration of their businesses and obtain maximum value for their assets for the benefit of all of stakeholders. The Postpetition Facility will provide the Debtors with sufficient liquidity to operate during the Sale process and the Stalking Horse Bid sets a floor price for what the Debtors hope will be an open, competitive and ultimately successful auction.

33. In order to achieve their goals in Chapter 11, the Debtors seek the relief set forth in the First Day Motions, as summarized below.

### IV.

### FACTS IN SUPPORT OF FIRST DAY PLEADINGS[2]

34. To minimize the adverse effects of the commencement of these Chapter 11 Cases on the Debtors' ability to effectuate a timely and efficient restructuring process that will preserve and maximize the value of the Debtors' estates, the Debtors have filed the following First Day Motions:

- Motion of the Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases;

- Debtors' Application Seeking an Order (I) Authorizing and Approving the Appointment of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent and (II) Granting Related Relief;

---

[2] Capitalized terms not defined within this Section IV shall have the meaning ascribed to such terms in the respective First Day Motions.

- Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) Authorizing the Continued Use of Intercompany Transactions and Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (D) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(B) and the United States Trustee Operating Guidelines;

- Motion for Entry of an Order Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations;

- Motion of the Debtors foFr Entry of Interim and Final Orders (a) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service, (b) Deeming Utilities Adequately Assured of Future Performance, and (c) Establishing Procedures for Determining Adequate Assurance of Payment;

- Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Tax and Fee Obligations and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of the Debtors for Entry of an Order Authorizing the Debtors to (I) Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder, and Renew or Enter Into New Policies, and (II) Continue Insurance Premium Financing Programs, Pay Insurance Premium Financing Obligations Arising In Connection Therewith and Renew or Enter Into New Premium Financing Arrangements;

- Motion of the Debtors for Entry of Interim and Final Orders (a) Authorizing the Debtors to Pay all or a Portion of the Prepetition Claims of Certain Critical Vendors, and (b) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion for Entry of An Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business;

- Motion for Entry of an Order (I) Authorizing Debtors to Honor Interline Agreements, Clearinghouse Agreements and Code Share Agreements and Prepetition Obligations Related Thereto, (II) Modifying the Automatic Stay Solely to the Extent Necessary to Effectuate the Intended Relief and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers;

- Motion of the Debtors and Debtors-In-Possession for Entry of an Order (A) Approving Bidding Procedures in Connection with a Transaction by Public Auction; (B) Scheduling a Hearing to Consider the Transaction; (C) Approving the Form and Manner of Notice Thereof, (D) Approving Contract Procedures, and (E) Granting Related Relief ("Bid Procedures Motion");

- Motion of the Debtors for Entry of an Order (I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of all Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption and Assignment or Rejection of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief ("Sale Motion");

- Motion of Debtors and Debtors-in-Possession for Interim and Final Orders Authorizing the Debtors to: (A) Incur Postpetition Debt; (B) Provide Adequate Protection; (C) Use Cash Collateral; and (D) Grant Certain Liens and Provide Security and Other Relief to Prepetition Secured Parties ("DIP Motion");

- Application of the Debtors to Approve the Employment and Retention of Landis Rath & Cobb LLP as Their Bankruptcy Counsel, *Nunc Pro Tunc* to the Petition Date, Pursuant to Bankruptcy Code Section 327(a), Bankruptcy Rule 2014 and Local Rule 2014-1;

- Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Seabury Corporate Advisors LLC as Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date and a Waiver of Compliance with Certain of the Requirements of Local Rule 2016-2;

- Application of the Debtors and Debtor-In-Possession to Approve the Employment and Retention of Stinson Leonard Street LLP as Regulatory Counsel *Nunc Pro Tunc* to the Petition Date Pursuant to Bankruptcy Code Sections 327(e) and 328(a), Bankruptcy Rule 2014(a) and Local Rule 2014-1;

- Application of the Debtors for Entry of an Order (I) Authorizing the Employment and Retention of Sonoran Capital Advisors, LLC to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designating Matthew Foster as the Debtors' Chief Restructuring Officer, *Nunc Pro Tunc* to the Petition Date; and

- Application of the Debtors for Entry of an Order (I) Authorizing the Employment and Retention of Embark Aviation Corp. to Provide the Debtors a Chief Executive Officer and Certain Additional Personnel, and (II) Designating Benjamin Munson as the Debtors' Chief Executive Officer, *Nunc Pro Tunc* to the Petition Date; and

- Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of Rust Consulting/Omni Bankruptcy as Administrative Agent for the Debtors *Nunc Pro Tunc* to the Petition Date.

35. I have reviewed each of the First Day Motions, including any exhibits thereto, and incorporate by reference each of the factual statements set forth in the First Day Motions. I believe that the relief requested by the First Day Motions is necessary to enable to the Debtors to preserve and maximize value and efficiently implement their restructuring efforts with minimal disruption and delay.

## Declaration

36. Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

## Relief Requested

37. I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just and proper.

Dated: January 8, 2018

SEASTAR HOLDINGS, INC.
SEABORNE VIRGIN ISLANDS, INC.
SEABORNE PUERTO RICO, LLC

_____
Matthew Foster
Chief Restructuring Officer