# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

SEASTAR HOLDINGS, INC., *et al.*[1]

Debtors.

Chapter 11

Case No. 18- 10039 (SS)

Joint Administration Requested

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF CERTAIN ASSETS OF THE DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (the "Debtors"), by and through their proposed undersigned counsel, hereby submit this motion (the "Sale Motion") seeking the entry of an order, (i) approving the asset purchase agreement (the "Asset Purchase Agreement"), a copy of which is attached as **Exhibit A** to the Sale Order (defined herein) among the Debtors and SB Acquisition 2017, Inc. (the "Stalking Horse Purchaser"), or a Successful Bidder,[2] as applicable, and authorizing the sale of the Acquired Assets outside of the ordinary course of business; (ii) authorizing the sale free and clear of all Liens, Claims, Encumbrances, and Interests (as defined in the attached Asset Purchase Agreement) (other than Assumed Liabilities, Permitted Liens and Permitted Exceptions) (the "Sale") of the Acquired Assets to the Buyer; (iii) authorizing the assumption and assignment of Assumed Contracts; (iv) authorizing the Debtors

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: SeaStar Holdings, Inc. (0418), Seaborne Virgin Islands, Inc. (5458), and Seaborne Puerto Rico, LLC (3572). The Debtors' corporate headquarters and the mailing address is World Plaza Building, 9th Floor, 268 Munoz Rivera Avenue, San Juan, Puerto Rico 00918.

[2] Terms utilized but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, First Day Declaration (defined below) or the Bid Procedures Motion (defined below), as applicable.

to change their corporate name and the caption of these Chapter 11 Cases; and (v) granting related relief.  In support of the Motion, the Debtors rely on the *Declaration of Matthew Foster in Support of First Day Pleadings* (the "First Day Declaration") and state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[3]

2.      The statutory predicates for the relief requested herein are pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), and rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

---

[3] Pursuant to Local Rule 9013-1(f), the Debtors hereby confirm their consent to entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

3.     On the date hereof (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the Court.

4.     The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to Bankruptcy Code sections 1107(a) and 1108.  As of the date of this Motion, no trustee, examiner or statutory committee has been appointed in these Chapter 11 Cases.

5.     Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' business and capital structure is set forth in detail in the First Day Declaration filed contemporaneously herewith with this Motion and incorporated herein by reference.

6.     Also filed contemporaneously herewith is the *Motion of the Debtors and Debtors-In-Possession for Entry of an Order (I) Approving Bidding Procedures in Connection with a Transaction By Public Auction; (II) Scheduling a Hearing to Consider the Transaction; (III) Approving the Form and Manner of Notice Thereof and (IV) Approving Contract Procedures* (the "Bid Procedures Motion"), which is incorporated herein by reference.  The Bid Procedures Motion seeks approval of, among other things, the Bidding Procedures and Contracts Procedures.  The Bidding Procedures provide for, among other things, the requirements for Qualified Bidders to submit Qualified Bids and participate in an Auction.  The Contracts Procedures provide for, among other things, the deadlines and requirements for the Debtors to assume and assign contracts.

7.     As explained in the First Day Declaration, in early 2016, the Debtors began exploring their strategic options to obtain additional debt or equity financing, the sale of their

assets or otherwise restructure their debt.  The Debtors, on their own, reached out to numerous strategic investors and obtained two letters of interest.  In addition, on May 16, 2016, the Debtors engaged Seabury Corporate Advisors, LLC ("Seabury"), the preeminent aviation consulting firm, to assist in selling their assets or obtaining additional capital investments (the "2016 Process").  Through the 2016 Process, Seabury reached out to over twenty (20) potential strategic and financial investors, resulting in six (6) non-disclosure agreements with interested parties.  In the summer of 2016, the Debtors engaged in negotiations with one of the interested parties but no agreement was reached.  In March 2017, Versa Capital Fund ("Versa") provided an additional letter of intent.

8.    Versa's letter of intent included exclusive negotiations with Montecito New York, LLC ("Montecito"), the Debtors' then majority equity holder and senior secured lender pursuant to that certain Loan and Security Agreement, dated as of April 25, 2016 (the "Loan Agreement"). On June 14, 2017, Montecito assigned all of its right, title and interest in the Loan Agreement and all related guarantees and similar documents to Volant SVI Funding, LLC ("Volant Funding"), a Versa affiliate.  In addition, between June 14 and June 20 , 2017, Montecito assigned its interests in five (5) then-current aircraft lease agreements to Volant Leasing, another Versa affiliate.  Montecito also sold the underlying aircraft associated those lease agreements to Volant Leasing.  Montecito also assigned to Volant Leasing all of its right, title and interest in and to all rent, maintenance fees and other amounts due and owing pursuant to six (6) terminated aircraft lease agreements.    Versa, through its affiliate Volant SVI, Inc., also purchased approximately eighty percent (80%) of SHI's outstanding common equity and one hundred percent (100%) of its preferred equity, from Montecito and other shareholders.

9.      As set forth in the First Day Declaration, the Debtors understanding is that Versa's acquisition of SHI's equity, the Loan Agreement, and the Volant Leases was part of an overall strategy to merge the Debtors with a complimentary Versa portfolio company—Silver Airways, Inc., which is headquartered in Florida and offers flights within Florida and to the Bahamas also exclusively using Saab aircraft fleet.

10.     In light of the continued deterioration of the Debtors' cash position and present lack of realistic stand-alone restructuring options, the Debtors, in the exercise of their reasonable business judgment, determined that the most effective way to maximize the value of the Debtors' estates for the benefit of its stakeholders was to seek bankruptcy protection in order to sell substantially all of their assets through a Sale pursuant to Bankruptcy Code section 363.  In connection therewith, the Debtors re-engaged Seabury to again market the Debtors' assets. Seabury has begun preparing its marketing materials and will market the Debtors' assets postpetition for sale to potential purchasers other than the Stalking Horse Purchaser and solicit Qualified Bids from Qualified Bidders

***The Proposed Sale***

11.     The Stalking Horse Purchaser has agreed to purchase the Acquired Assets by providing a "combination" of releases of obligations, $5 million in senior secured debt, with respect to the Postpetition Facility and Credit Agreement, a cash bid of $100,000, plus the assumption of the Assumed Liabilities, subject to higher or otherwise better offers.  The Debtors believe, in the exercise of their business judgment, that such Sale provides the best restructuring alternative for all of their creditor constituencies and stakeholders.  Indeed, given that the Debtors have limited cash and no realistic financing option other than the Postpetition Facility, which itself depends on the Sale process moving forward as proposed, the only alternative to the

Sale would be a conversion of this case to Chapter 7 and a piecemeal liquidation of the Debtors'

assets—which would surely result in less value to the Debtor's stakeholders, in addition to a loss

of their operating business and a termination of their employees' jobs.

12.    The following chart summarizes key provisions/aspects of the Asset Purchase

Agreement, as well as any provisions required to be highlighted pursuant to Local Rule 6004-

1(b)(iv), but is qualified in its entirety by reference to the actual Asset Purchase Agreement

attached hereto as **Exhibit A**.[4]

| **Purchase Price** | In consideration of the sale of the Business and the Acquired Assets, the Purchase Price: |
|---|---|
| **(Section 3.1)** | (a)    shall be equal to the sum of $5,000,0000, payable in the Stalking Horse Purchaser's sole and absolute discretion, on a dollar for dollar basis, by offset (i) to the DIP Facility Obligations evidenced by the Stalking Horse Purchaser delivering to Sellers releases and waivers, fully executed, from the applicable lenders (in each of their respective sole and absolute discretion) under the DIP Credit Agreement with respect to all of a part of Sellers' obligations thereunder and/or with the written consent of the applicable lenders under the DIP Credit Agreement (in each of their respective sole and absolute discretion), by the Stalking Horse Purchaser assuming all or a part of Sellers' obligations thereunder on terms reasonably acceptable to the Stalking Horse Purchaser in its sole and absolute discretion; and (ii) to the obligations outstanding under the Credit Agreement, evidenced by the Stalking Horse Purchaser delivering to Sellers releases and waivers, fully executed, from the applicable lenders (in each of their respective sole and absolute discretion) under the Credit Agreement with respect to all of a part of Sellers' obligations thereunder and/or with the written consent of the applicable lenders under the Credit Agreement (in each of their respective sole and absolute discretion), by the Stalking Horse Purchaser assuming all or a part of Sellers' obligations thereunder on terms reasonably acceptable to the Stalking Horse Purchaser in its sole and absolute discretion), plus<br><br>(b)    $100,000, plus |

---

[4] This description of the Asset Purchase Agreement is intended as a summary only.  To the extent that there is any discrepancy between this summary and the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

| | |
|---|---|
| | (c)    Assumption of the Assumed Liabilities. |
| **Sale to Insider**<br><br>**Local Rule 6004-1(b)(iv)(A)** | The Stalking Horse Purchaser is an affiliate of Versa, Volant SVI, Inc., Volant Funding, and Volant Leasing and under the definition contained in Bankruptcy Code section 101(31) is an "insider" of the Debtors. |
| **Good Faith Deposit**<br><br>**Local Rule 6004-1(b)(iv)(F)** | No deposit is required of the Stalking Horse Purchaser, however, a good faith deposit is required for all other Qualified Bidders as set forth in the Bid Procedures. |
| **Competitive Bidding/Auction**<br><br>**Local Rule 6004-1(b)(iv)(D)**<br><br>**(Section 8.1)** | The Asset Purchase Agreement contemplates an Auction to be conducted in accordance with the Bidding Procedures Order. |
| **Acquired Assets**<br><br>**(Section 2.1)** | The assets to be sold are substantially all of the assets of the Debtors, other than the Excluded Assets. Specifically, the Acquired Assets include:<br>• all Cash;<br>• all Accounts Receivable;<br>• all owned Inventories, including of rotable and consumable spare parts;<br>• all airport Facility Leases, agreements and licenses or arrangements at Stations within the Caribbean Basin at, or served from, San Juan Puerto Rico and at, or served from the Charlotte Amalie Seaplane Base in St. Thomas and/or the Seaplane base in St. Croix, U.S. Virgin Islands (collectively, the "Station Leases"), which the Stalking Horse Purchaser elects by written notice to Seller given not less than three (3) days prior to the date on which the Auction occurs to assume at and from Closing together with all Station Property, in each case relating to such assumed Station Leases (collectively, the "Acquired Station Assets");<br>• Sellers' Certificate of Public Convenience and Necessity issued by the U.S. Department of Transportation under 49 U.S.C. Chapter 411 and Seller's Air Carrier Certificate and Operations Specifications issued by the Federal Aviation Administration under 14 CFR Part 121;<br>• all Route Authority to destinations served from San Juan Puerto Rico, and/or from the Charlotte Amalie Seaplane Base in St. Thomas and/or the Seaplane base in St. Croix, U.S. Virgin Islands;<br>• all Code Share Agreements;<br>• all Sellers' rights under existing Revenue Guaranties and other support agreements, and similar items of Seller;<br>• all deposits (including, without limitation, security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), |

advances, prepayments, reserves, rights in respect of promotional allowances, vendor rebates and other refunds, claims, causes of action, rights of recovery, rights under guaranties, rights of set off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non contingent), and the right to receive and retain mail, Accounts Receivable payments and other communications of Seller and the right to ticket revenue in respect to transportation or other services performed but unbilled or uncollected as of the Closing, provided, however, all deposits provided to any utility provider under Bankruptcy Code section 366 shall be payable to the Stalking Horse Purchaser upon termination of the utility service;

- to the extent that such lease (and any such agreement related thereto, if any) is an Assigned Contract, all rights under a lease (and any agreement related thereto) for a Leased Property, in each case together with all interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

- all owned aircraft engines and propellers;

- all owned real property fixtures;

- all information technology systems;

- all owned office furniture and furnishings;

- all pre-Closing ticket sales proceeds for flights to be flown post Closing;

- all owned Ground Support Equipment and other FF&E;

- all Intellectual Property;

- all Assigned Contracts;

- all Documents;

- all Permits;

- all recoverable overpayments of air transportation related governmental fees and charges;

- except to the extent that such insurance policy is an Excluded Asset under Section 2.2(i) of the Asset Purchase Agreement and to the extent assignable, all rights under or arising out of all insurance proceeds and insurance policies relating to the Business or any of the Acquired Assets (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to Seller, with respect to cancelled policies), unless non-assignable as a matter of Law;

- all motor vehicles owned by Seller;

- all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties (including, without limitation, any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction);

|  |  |
|---|---|
|  | • any rights, claims or Causes of Action, including all Causes of Action arising under chapter 5 of the Bankruptcy Code, against any Person; |
|  | • all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products or services purchased by or provided, to Seller or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets; |
|  | • all books and records of Sellers (excluding Sellers' corporate and limited liability company books and records and corporate and limited liability company proceedings, financial and Tax and records, work papers and other records that Sellers are required by Law to retain, copies of which, however, shall be provided to the Stalking Horse Purchaser upon request); |
|  | • all sales and promotional materials, catalogues and advertising literature; |
|  | • all bank accounts, checkbooks and cancelled checks of Seller; |
|  | • all Data and Documents; |
|  | • all (or the benefit of all, to the extent not assignable) Tax refunds, rebates, credits and similar items of Seller, in each case relating to any period, or portion of any period, on or prior to the Closing Date or any Tax Return; |
|  | • all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names; |
|  | • the assets, if any, listed on Schedule 2.1(gg) of the APA (regardless of whether such assets are covered by any of the foregoing); |
|  | • all goodwill of the Business; and |
|  | • other assets related to, associated with or used in the conduct of the Business and/or the Acquired Assets, excepting therefrom only the Excluded Assets. |
| **Excluded Assets** <br><br> **(Section 2.2)** | Excluded Assets include: <br> • any asset of Sellers that would constitute an Acquired Asset but for the fact that it is conveyed, leased or otherwise disposed of, in the Ordinary Course of Business prior to the Closing Date not in violation of the Asset Purchase Agreement; <br> • the cash portion of the Purchase Price as set forth in Section 3.1(b) and all Cash of Seller funded under the DIP Credit Agreement for the payment of professional fees and disbursement or held as retainers or deposits by such professionals; <br> • the corporate and limited liability company books and records of the Sellers and corporate proceedings, financial and Tax records, work papers and other records that Sellers are required by Law to retain; |

| | provided, however, copies of the foregoing items shall be provided by Sellers to the Stalking Horse Purchaser upon request; |
|---|---|
| | • the rights of Sellers under the Asset Purchase Agreement and all cash and non-cash consideration payable or deliverable to Sellers under the Asset Purchase Agreement; |
| | • all rights and interests in connection with, and assets of, any Employee Benefit Plan; |
| | • all shares of capital stock or other equity interests in Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in Sellers; |
| | • the assets, if any, listed on Schedule 2.2(h); |
| | • all rights under or arising out of insurance policies not relating to the Business or the Acquired Assets; |
| | • all Tax attributes of Sellers; |
| | • all Rejected Contracts and all Additional Rejected Contracts; and |
| | • Permits that are not transferable. |
| **Agreements with Management**<br><br>**Local Rule 6004-1(b)(iv)(B)**<br><br>**(Section 6.4(g))** | The Asset Purchase Agreement requires the Stalking Horse Purchaser to adopt and be solely responsible for the payment of the  Key Employee Incentive Plan set forth in Schedule 6.4(g), which includes the following provisions:<br><br>Each Participant shall receive their Award payable within thirty (30) days of the occurrence of the following Payment Events:<br><br>    • He or she is terminated by the Sellers without cause within 180 days of the date of this Agreement, provided, he or she has not been offered employment by the Purchaser; or<br>    • On the 180th day after this Agreement, provided, he or she does not voluntarily leave the Sellers.<br><br>Any and all Awards payable under the Plan will be made not later than thirty (30) days after the date of the foregoing Payment Event and shall be paid by Purchaser.<br><br>Awards shall not be considered wages, salaries or compensation under any employee benefit plan, except pursuant to the written terms of such plan.  All legally required taxes will be withheld from the above amounts at time of payment. |
| **Sale of Avoidance Actions**<br><br>**Local Rule 6004-1(b)(iv)(K)**<br><br>**(Section 2.1(y))** | The Stalking Horse Purchaser is purchasing any rights, claims or Causes of Action, including all Causes of Action arising under chapter 5 of the Bankruptcy Code, against any Person. |

| | |
|---|---|
| **Releases**<br><br>**Local Rule 6004-1(b)(iv)(C)**<br><br>**(Sections 9.2(d) and 12.16)** | Effective upon the Closing, each Seller, on behalf of itself and its estate, shall release any claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of the Stalking Horse Purchaser's pre-Petition Date Claims, Encumbrances, and Liens) against the Stalking Horse Purchaser or any of its Related Persons, that directly or indirectly arise out of, relate to, are based upon, or in any manner are connected with Sellers, any of their Related Persons or the Business (collectively, the "Released Claims") (including, without limitation, (i) the pre-Petition Date Contracts to which the Stalking Horse Purchaser (or any of its Affiliates) and Sellers were parties and all transactions referred to in such Contracts and (ii) any acquisition by the Stalking Horse Purchaser of Claims and Liens in and against Sellers). Sellers, on behalf of themselves and their estates, hereby (i) release and discharge the Stalking Horse Purchaser and each of its Related Persons from any claim, cause of action, liability or obligation whatsoever with respect to the Released Claims and (ii) releases, waives and discharges all of the Released Claims against the Stalking Horse Purchaser and each of its Related Persons.<br><br>In addition, as a condition precedent to performance by the Stalking Horse Purchaser, the Stipulations and the Releases (each as defined in the DIP Orders) shall have become finally entered and binding on all Persons, in each case in form and substance acceptable to Stalking Horse Purchaser in its sole and absolute discretion. |
| **Assumed Liabilities**<br><br>**(Section 2.3)** | The Stalking Horse Purchaser is assuming the following Assumed Liabilities:<br>• all of Sellers' liabilities and obligations under the Assigned Contracts arising after Closing;<br>• current liabilities consisting solely of accounts payable to vendors (i) solely in respect of goods received by Sellers within twenty (20) days prior to the Petition Date (as defined herein) that were sold to Sellers in the ordinary course of business during such twenty (20) days, but only to the extent that such payables are allowed administrative claims in the Bankruptcy Case pursuant to Bankruptcy Code section 503(b)(9) and (ii) that were incurred in the Ordinary Course of Business from and after the Petition Date through the Closing solely in connection with goods purchased by, and services provided to, Sellers during such period (it being understood and agreed that no liabilities that expressly constitute Excluded Liabilities or are included within the Cure Amounts shall be assumed by the Stalking Horse Purchaser pursuant to clauses (i) or (ii) of this Section 2.3(b)); |

|  | ● ordinary accruals for wages, commissions, vacation days, sick days and expense reimbursements of the Transferred Employees (as defined herein) that accrued in the Ordinary Course of Business solely for the period from and after the Petition Date through the Closing to the extent not paid prior to Closing (but expressly excluding all liabilities and obligations (i) relating to worker's compensation claims which remain unpaid as of the Closing Date (whether reported or not), (ii) relating to the exempt or non-exempt status of any Transferred Employee, (iii) relating to litigation, including without limitation any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended, or similar state Law, and any whistleblower claims and/or (iv) retained by Sellers in accordance with Section 2.4 or Section 6.4) and/or (v) arising under the Puerto Rico Unjust Discharge Act, Law No. 80 of May 30, 1976, as amended, P.R. Laws Ann. Tit. 20 Section 185a *et seq.*;<br>● any post-petition ordinary course payables to the extent not paid prior to Closing, but excluding any post-petition obligations incurred outside of the ordinary course, including but not limited to any fees or expenses incurred in connection the Sellers' chapter 11 case, and<br>● those specific liabilities and obligations of Sellers (if any) identified on Schedule 2.3(e) |
|---|---|
| **Excluded Liabilities**<br><br>**(Section 2.4)** | The Stalking Horse Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible or liable for, any of the Excluded Liabilities. Excluded Liabilities include, but shall not be limited to:<br>● any and all liabilities arising under any Aircraft Lease and under any aircraft engine, propeller or spare parts lease not assumed by the Stalking Horse Purchaser pursuant to Section 2.1(d) of the Asset Purchase Agreement;<br>● any and all liabilities arising under any Station Lease not assumed by the Stalking Horse Purchaser pursuant to Section 2.1(d) of the Asset Purchase Agreement;<br>● any and all liabilities and obligations for Taxes arising from or with respect to the Acquired Assets or the Business to the extent attributed to the operation of the Business on or before the Closing Date or the transactions contemplated by the Asset Purchase Agreement other than Taxes specifically identified in Section 2.3(e);<br>● any and all liabilities for indebtedness of Sellers with respect to borrowed money (other than (x) obligations with respect to capitalized leases, if any, that are Assigned Contracts and (y) any of the Obligations assumed pursuant to Section 3.1(b) of the Asset Purchase Agreement;<br>● any and all liabilities and obligations arising under |

any Environmental Law or any other Law (including as a result of any action or inaction of Seller or of any third party) relating to the storage, use or operation of the Acquired Assets;

- any and all liabilities and obligations for any violation of any Law;

- any and all liabilities and obligations for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Case (including, without limitation, the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers, and the official creditors' committee, the fees and expenses of the post-petition lenders and pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated under the Asset Purchase Agreement;

- any and all liabilities and obligations of Sellers to the extent that their existence or magnitude constitutes or results in a breach of a representation, warranty or covenant made by Sellers to the Stalking Horse Purchaser under the Asset Purchase Agreement, or makes the information contained in the any Schedule incorrect or incomplete;

- any liabilities of Sellers under those Contracts and Permits which constitute Excluded Assets or which are not assigned to the Stalking Horse Purchaser pursuant to the provisions of the Asset Purchase Agreement;

- any and all liabilities and obligations (i) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other proceeding as of the Closing Date, (ii) with respect to periods prior to the Closing Date and are or could be asserted as a claim in litigation or arbitration after the Closing Date, (iii) relating to any bodily injury, or damage to property, incurred by any Person or (iv) arising as a result of actions or omissions with respect to services provided to customers prior to the Closing;

- any liabilities or obligations which the Stalking Horse Purchaser may or could become liable for as a result of or in connection with any "defacto merger" or "successor-in-interest" theories of liability;

- those specific liabilities and obligations of Sellers identified on Schedule 2.4(l) attached to the Asset Purchase Agreement;

- all liabilities or obligations arising under any Employee Benefit Plan;

- any liability or obligation of Sellers to their respective stockholders, members or other equity holders or affiliates;

|  | • any costs and expenses that may be recovered from the Acquired Assets on account of the operation of Bankruptcy Code section 506(c); <br><br> • any liabilities arising out of any representation, warranties, actions or failure to act by Sellers in connection with any Assigned Contract, including any claims by any person or entity other than the counter-party to such Assigned Contract; and <br><br> • without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of Sellers or arising out of or related to the Acquired Assets or the Business that are not expressly assumed by the Stalking Horse Purchaser pursuant to the provisions of Section 2.3 of the Asset Purchase Agreement. |
|---|---|
| **Sale Free and Clear of Liens** <br><br> **Local Rule 6004-1(b)(iv)(M)** <br><br> **(See Sections 2.1 and 4.4)** | The Seller seeks to transfer, and the Stalking Horse Purchaser seeks to purchase, the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than any exceptions expressly set forth on Schedule 4.4 hereto (the "Permitted Exceptions") and Permitted Liens, and the Stalking Horse Purchaser will be vested, to the maximum extent permitted by Bankruptcy Code sections 363 and 365, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Exceptions and Permitted Liens. |
| **Record Retention** <br><br> **Local Rule 6004-1(b)(iv)(J)** <br><br> **(Section 6.3(c))** | From and after the Closing Date, each party hereto shall provide the other parties hereto (and their respective representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the books and records acquired pursuant to the Asset Purchase Agreement so as to enable the Stalking Horse Purchaser and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal actions or for other like purposes, including, but not limited to claims objections and resolutions.  If any party desires to dispose of any such records, such party shall, thirty (30) days prior to such disposal, provide the other party with a reasonable opportunity to remove such records to be disposed of at the removing party's expense. |
| **Representations and Warranties** <br><br> **(Sections 4 and 5)** | The Agreement contains certain representations and warranties by the Sellers and the Stalking Horse Purchaser. |
| **Closing** <br><br> **Local Rule 6004-1(b)(iv)(E)** <br><br> **(Section 10.1)** | The Asset Purchase Agreement requires that Closing occur in the offices of Landis Rath & Cobb LLP, 919 N. Market Street, Suite 1800, Wilmington, DE 19801 at 10:00 a.m., Eastern Time on the first Business Day on which all conditions (except for only those conditions that by their terms can only be satisfied on the Closing |

| | Date) to the obligations of the parties hereto set forth in Article 9 of the Asset Purchase Agreement to consummate the transactions contemplated hereby are first satisfied and/or waived, or at such other time, date and place as the parties shall mutually agree. |
|---|---|
| **Conditions Precedent to Obligations of Seller and Buyer**<br><br>**(Sections 9.1 and 9.2)** | Conditions precedent to the Sellers' performance under the Asset Purchase Agreement include the following:<br><br>• Each and every representation and warranty of the Stalking Horse Purchaser made in the Asset Purchase Agreement that is qualified by a materiality standard, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of the Stalking Horse Purchaser made in the Asset Purchase Agreement that is not qualified by a materiality standard, in each case, shall have been true and correct when made in all material respects and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date.<br><br>• The Stalking Horse Purchaser shall have performed in all material respects (i) all obligations required under the Asset Purchase Agreement that are to be performed by the Stalking Horse Purchaser on or before the Closing Date (except with respect to (1) obligations which the Stalking Horse Purchaser is to perform as of the Closing under the Asset Purchase Agreement (including, without limitation, the obligation to pay the Purchase Price), the Stalking Horse Purchaser shall be ready, willing and able to perform such obligations against performance by Sellers hereunder and simultaneously with the Closing the Stalking Horse Purchaser shall so perform such obligations and (2) any obligations qualified by materiality, which obligations shall be performed in all respects as required under the Asset Purchase Agreement) and (ii) all obligations required under each Ancillary Agreement to which P the Stalking Horse Purchaser is a party that are to be performed thereunder by the Stalking Horse Purchaser on or before the Closing Date (except with respect to (I) obligations which the Stalking Horse Purchaser is to perform as of the Closing under the applicable Ancillary Agreement, the Stalking Horse Purchaser shall be ready, willing and able to perform such obligations against performance by Sellers thereunder and simultaneously with the Closing the Stalking Horse Purchaser shall so perform such obligations and (II) any obligations qualified by materiality, which obligations shall be performed in all respects as required under the applicable Ancillary Agreement).<br><br>• The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay. |

- No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.
- The Bidding Procedures Order shall have been entered in the Bankruptcy Cases.
- The Bankruptcy Court shall have authorized in the Bankruptcy Sale Order the assumption and assignment of the Assumed Contracts.

Conditions precedent to the Stalking Horse Purchaser's performance under the Agreement include the following:

- Each and every representation and warranty of Sellers made in the Asset Purchase Agreement that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of Sellers made in the Asset Purchase Agreement that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct when made in all material respects and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date (disregarding for all purposes of Section 9.2(a) of the Asset Purchase Agreement and any supplement or amendment to any of the Schedules pursuant to Section 6.3(a) of the Asset Purchase Agreement).
- Sellers shall have performed in all material respects (i) all obligations required by Sellers under the Asset Purchase Agreement that are to be performed by Sellers on or before the Closing Date (except with respect to (1) obligations which Sellers is to perform as of the Closing under the Asset Purchase Agreement, Sellers shall be ready, willing and able to perform such obligations against performance by the Stalking Horse Purchaser hereunder and simultaneously with the Closing, Sellers shall so perform such obligations and (2) any obligations qualified by materiality, which obligations shall be performed in all respects as required under the Asset Purchase Agreement) and (ii) all obligations required under each Ancillary Agreement to which any Seller is a party that are to be performed thereunder by Seller on or before the Closing Date (except with respect to (I) obligations which Seller are to perform as of the Closing under the applicable Ancillary Agreement, Sellers shall be ready, willing and able to perform such obligations against performance by the Stalking Horse Purchaser thereunder and simultaneously with the Closing Sellers shall so perform such obligations and (II) any obligations qualified by materiality, which obligations shall be

performed in all respects as required under the applicable Ancillary Agreement).

- The Bankruptcy Sale Order shall have been entered by the Bankruptcy Court and (i) shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by the Asset Purchase Agreement, and (ii) the Bankruptcy Sale Order shall have become a final and nonappealable order, unless this condition in this clause (ii) has been waived in writing by the Stalking Horse Purchaser in its sole and absolute discretion.

- The Stipulations and the Releases (each as defined in the DIP Orders) shall have become finally entered and binding on all Persons, in each case in form and substance acceptable to the Stalking Horse Purchaser in its sole and absolute discretion.

- No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

- The Bidding Procedures Motion shall have been filed in the Bankruptcy Case on the Petition Date.

- The Bidding Procedures Order shall have been entered in the Bankruptcy Case no later than twenty-one days from the Petition Date.

- The Bankruptcy Sale Order shall exempt Sellers and the Stalking Horse Purchaser from compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by the Asset Purchase Agreement.

- Subject to Section 2.5(e) of the Asset Purchase Agreement, the Bankruptcy Court shall have authorized in the Bankruptcy Sale Order the assumption and assignment of the Assumed Contracts to the Stalking Horse Purchaser on terms satisfactory to Purchaser.

- No Claim shall have been brought by any Person against any of Purchaser, Agent (as defined in the Credit Agreement), Lenders (as defined in the Credit Agreement and the DIP Credit Agreement) or any of their affiliated or related Persons, and, to the extent applicable, all periods in which any Claim could be brought against any of the foregoing by any Person shall have expired.

- The Stalking Horse Purchaser shall have obtained Permits in replacement of any Permits that are not transferable by Sellers to the Stalking Horse Purchaser and that are necessary for the Stalking Horse Purchaser to take title to all of the Acquired Assets at Closing and thereafter to operate all aspects of the Business including specifically approval by the United States Department of Transportation of the

|  | transfer to the Stalking Horse Purchaser of Sellers' Certificate of Public Convenience and Necessity and to any necessary approval of the right to provide regularly scheduled passenger and freight air transportation services on the Sellers' international routes under Route Authority to be acquired from Sellers. |
|  | • The Air Carrier Certification Process under Title 14 of the Code of Federal Regulations (14 CFR) for Part 121 air carriers shall have been accomplished with the FAA such that the Stalking Horse Purchaser shall be entitled to commence providing air transportation for passengers and freight pursuant to Route Authority to be acquired from Sellers. |
|  | • Any consents required to the assignment or transfer of the Assigned Contracts, including without limitation, the Acquired Station Assets, Code Share Agreements, Engine Services Contract and the international Route Authority to be acquired from Sellers shall have been obtained to the reasonable satisfaction of the Stalking Horse Purchaser. In addition, the Stalking Horse Purchaser shall have, with respect to any asset of Sellers that may be secured by a purchase money security interest, security interest or lien that is senior to any security interest or lien of the Stalking Horse Purchaser, entered into a lease with Sellers, in the Stalking Horse Purchaser's sole and absolute discretion, whereby the Stalking Horse Purchaser leases certain assets rather than purchasing such assets as an Acquired Asset hereunder. |
|  | • Other than pre-petition defaults, there shall be no defaults, violations or breaches of, or under, any Contracts to which any Seller is a party. |
|  | • There shall be no violations of Law that, in the opinion of the Stalking Horse Purchaser in its sole and absolute discretion, could adversely affect in any manner the Stalking Horse Purchaser's operation of the Business. |
|  | • All of the Schedules and Exhibits shall have been delivered prior to execution of the Asset Purchase Agreement and shall be acceptable to Stalking Horse Purchaser in its sole and absolute discretion. |
| **Termination Events** <br><br> **(Section 11)** | There are several circumstances in which the Asset Purchase Agreement may be terminated pre-Closing, which include the following: <br><br> (a) by mutual written consent of Sellers and the Stalking Horse Purchaser; <br><br> (b) automatically and without any action or notice by Sellers to the Stalking Horse Purchaser, or the Stalking Horse Purchaser to Sellers, immediately upon: <br><br> (i) the issuance of a final and non-appealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or |

otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii)    approval by the Bankruptcy Court of an Alternate Transaction;

(iii) acceptance by any Sellers of an Alternate Transaction; or

(iv) the Stalking Horse Purchaser is not declared the winning bidder upon completion of the Auction.

(c) by the Stalking Horse Purchaser:

(i) if the Bidding Procedures Order shall not have been entered within twenty-one (21) days after the First Day Hearing;

(ii) if the Auction has not concluded on or prior to seventy five (75) days from the First Day Hearing;

(iii) if the Bankruptcy Court has not entered the Bankruptcy Sale Order on or prior to seventy six (76) days from the First Day Hearing;

(iv) if there has been a material violation or breach by Sellers of any representation, warranty, agreement or covenant contained in the Asset Purchase Agreement (disregarding any supplement or amendment to any of the Schedules pursuant to Section 6.3(a) and the disclosure of Previously Omitted Contracts) which (x) has rendered the satisfaction of any condition to the obligations of the Stalking Horse Purchaser set forth in Section 9.2 of the Asset Purchase Agreement impossible or is not curable or, if curable, has not been cured within seven (7) days following receipt by Sellers of written notice of such violation or breach from the Stalking Horse Purchaser, and (y) has not been waived by the Stalking Horse Purchaser;

(v) at any time after ninety (90) days from the First Day Hearing, if the Closing shall not have occurred;

(vi) if, prior to the Closing, the Bankruptcy Cases shall be converted into a cases under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(vii) if the DIP Credit Agreement has been terminated or any of the lenders' obligations under the DIP Credit Agreement are terminated;

(viii) if either of the interim or final order authorizing and approving the DIP Credit Agreement has not been entered within the time periods set forth therein;

(ix) if any of the Milestones (as defined in the DIP Credit Agreement) are not met;

(x) if there shall be excluded from the Acquired Assets any Assumed Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Sellers, to the extent that such consent shall

not have been given prior to the Closing and the exclusion of such Assumed Contract shall, in the opinion of the Stalking Horse Purchaser in its sole and reasonable discretion, prevent the Stalking Horse Purchaser from effectively operating the Business;

(xi) if the Stalking Horse Purchaser so elects in writing pursuant to Section 6.5 of the Asset Purchase Agreement;

(xii) if any Claim is brought by any Person against any of the Stalking Horse Purchaser, Agent (as defined in the Credit Agreement), Lenders (as defined in the Credit Agreement and the DIP Credit Agreement) or any of their affiliated or related Persons prior to the expiration of the applicable period in which such Claim could be brought;

(xiii) if Sellers have not delivered to the Stalking Horse Purchaser all of the Required Bankruptcy Deliveries on or prior to the fifteenth (15th) day following the Petition Date;

(xiv) if the Acquired Assets, in the opinion of the Stalking Horse Purchaser in its reasonable discretion, are not sufficient to enable the Stalking Horse Purchaser to effectively operate the Business;

(xv) if there exists any default, violation or breach of or under any Contract to which any Seller is a party;

(xvi) there exist any violations of Law (when either taken individually or in the aggregate) that either (x) were not disclosed by Seller to the Stalking Horse Purchaser by the Signing Date or (y) occurred after the Signing Date, and in the opinion of the Stalking Horse Purchaser in its reasonable discretion, could adversely affect in any manner the Stalking Horse Purchaser's operation of the Business;

(xvii) either the Schedules Delivery or the Exhibits Delivery has not occurred on or prior to the Delivery Date;

(xviii) the Schedules delivered by Sellers to the Stalking Horse Purchaser under the Asset Purchase Agreement are not all acceptable to the Stalking Horse Purchaser in its reasonable discretion; or

(xix) the Exhibits delivered by Sellers to the Stalking Horse Purchaser under the Asset Purchase Agreement are not all acceptable to the Stalking Horse Purchaser in its reasonable discretion.

| | |
|---|---|
| **Name Change**<br><br>**(Section 10.2(f))** | As part of the Closing, the Debtors must authorize and execute documents and amend organizational documents changing their names to another name which does not include "Seaborne" or "Seaborne Airlines" or other iteration thereof. |
| **Successor Liability**<br><br>**Local Rule 6004-1(b)(iv)(L)** | The proposed Sale Order will contain limitations on successor liability, and the Stalking Horse Purchaser will require that any order approving the Sale contain such |

| | |
|---|---|
| | limitations. |
| **Tax Exemption**<br><br>**Local Rule 6004-1(b)(iv)(I)**<br><br>**(Section 6.8)** | To the greatest extent permitted by applicable Law, the Stalking Horse Purchaser and Sellers hereby waive compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect to the transactions contemplated by the Asset Purchase Agreement.  The Bankruptcy Sale Order shall contain a finding by the Bankruptcy Court or shall decree that the Sellers and the Stalking Horse Purchaser are not required to comply with any such Laws. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>**Local Rule 6004-1(b)(iv)(O)** | The Debtors seek relief pursuant to Bankruptcy Rule 6004(h). |

## RELIEF REQUESTED

13.     By this Sale Motion, the Debtors seeks the entry of an order in the form attached hereto (the "Sale Order") (i) approving the Asset Purchase Agreement and authorizing the Sale outside the ordinary course of business, (ii) authorizing the Sale free and clear of all Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Liens and Permitted Exceptions), (iii) authorizing the assumption and assignment of certain Assumed Contracts, (iv) authorizing the Debtors to change their corporate name and the caption of these Chapter 11 Cases; and (v) granting related relief.

## BASIS FOR RELIEF

### I.      The Proposed Sale is Proper and Should Be Approved.

14.     The Debtors submit that ample authority exists for approval of the proposed Sale of the Acquired Assets pursuant to either the (i) Asset Purchase Agreement or (ii) the Successful Bid, as applicable.  Bankruptcy Code section 363(b)(1), which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances, provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11

U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

15.     Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *See In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also, Meyers v. Martin (In re Martin),* 91 F.3d 389, 395 (3rd Cir. 1996); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991); *In re Elpida Memory, Inc.,* 2012 Bankr. LEXIS 5367, *18 (Bankr. D. Del. Nov. 16, 2012) (explaining that the "section 363(b) standard is well-settled…[a] debtor may sell assets outside the ordinary course of business when it has demonstrated that the sale of such assets represented the sound exercise of business judgment").

16.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtor has obtained a fair and reasonable price; and (d) good faith. *See Abbotts Dairies,* 788 F.2d at 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). A debtor's showing of a sound business purpose need not be unduly exhaustive, rather a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of

each case. *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program and holding that the business purpose requirement was fulfilled, because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

17.    Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to Bankruptcy Code section 105(a), a court may fashion any order or decree that helps preserve or protect the value of a debtor's assets.  *See Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

18.    As discussed above, the Stalking Horse Purchaser is an affiliate of Versa, Volant Funding, and Volant Leasing.  Thus, the Stalking Horse Purchaser is an "insider" of the Debtors as defined in Bankruptcy Code section 101(31).  Notably, nothing in the Bankruptcy Code

prohibits section 363 sales to insiders, nor is such status any indication of "bad faith" in a transaction. *In re Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012 (7th Cir. 1988); *Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (stating that even if the buyer "were a fiduciary, a sale to him without more would not suffice to show a lack of good faith.") (citing *In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983)). Nevertheless, Courts usually view such sales with stricter scrutiny, due to the potential conflicts of interest in such transaction. *Abbotts Dairies*, 788 F.2d at 147-49; *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 837 (Bankr. E.D. Va., 1997) ("The Court concludes … that under [the circumstances where the Buyer is an insider], the proposed sale must face a higher scrutiny."). For this reason, courts generally require additional disclosures before approving a sale to an insider. *See In re Wild Horse Enters., Inc.*, 146 B.R. 830 (Bankr. C.D. Cal. 1991). Even under this stricter standard, however, the Court should approve the Sale, and the Successful Bidder, whether it be the Stalking Horse Purchaser or otherwise, is entitled to the good faith finding under Bankruptcy Code section 363(m) because the Acquired Assets were thoroughly marketed, and the terms of the Asset Purchase Agreement were negotiated at arms' length.

### A.    *A "Sound Business Purpose" Supports the Sale*

19.    As set forth in the First Day Declaration, prior to the Petition Date, the Debtors were plagued by the effects of Hurricanes Irma and Maria that deteriorated the Debtors' business value and threatened their ability to operate in the ordinary course of business. In the exercise of their reasonable business judgment, the Debtors determined that the most effective way to avoid further deterioration of their business and to maximize value of the Debtors' assets for all of their creditors and stakeholders was to seek bankruptcy protection in order to pursue a Sale of the Debtors' business.

20.    The Asset Purchase Agreement establishes a floor price for what the Debtors anticipate will be a robust Auction.  The Asset Purchase Agreement and the Bidding Procedures permit the Debtors to seek out higher or otherwise better offers at Auction.  This will ensure that the market sets the value for the Acquired Assets and that the Sale will maximize value of the Debtors' business for the benefit of all of the Debtors' stakeholders.  Accordingly, the Debtors have provided a sound business purpose in pursuing the approval of the Sale.

**B.**    ***Sufficient Notice of the Proposed Sale Has Been Provided to Interested Parties***

21.    Pursuant to the Bidding Procedures and the notice procedures set forth therein, the Debtors will employ various methods of notification to ensure that all interested and potentially affected parties will be informed of the Sale.  In order to generate the greatest number of bidders possible for the Sale and to satisfy the requirements of Bankruptcy Rule 2002, the Debtors will serve the Sale Notice upon the Sale Notice Parties.

22.    Additionally, the Debtors will file and serve the Cure Notice on all non-Debtor counterparties to the Contracts providing them with notice of this Motion, the potential assumption and assignment of their Contract and the Debtors' proposed Cure Payment.

**C.**    ***The Proposed Sale is for a Fair and Reasonable Price***

23.    The Debtors submit that the Purchase Price is fair and reasonable for the Acquired Assets.  As explained above, the Purchase Price in the Asset Purchase Agreement will serve as the floor price for competing bids.  In addition, the Asset Purchase Agreement provides for the Stalking Horse Purchaser's assumption of the Assumed Liabilities.

24.    The Bidding Procedures have been designed to ensure that the highest or otherwise best offer for the Acquired Assets will be attained.  With the assistance of Seabury, the Debtor is (i) conducting a comprehensive marketing process in order to maximize value,

(ii) soliciting the interest of various potential strategic and financial buyers and (iii) entertaining offers for a sale transaction that will maximize the value of the Debtors' business. The Debtors expect that their marketing efforts will result in the submission of one or more competing Qualified Bids prior to the proposed Bid Deadline. In the event the Debtors receive Qualified Bids other than the Asset Purchase Agreement, the Bidding Procedures provide that an Auction will be held to determine the highest or otherwise best bid.

25.     Because the ultimate purchase price for the Acquired Assets will be determined in accordance with the Court-approved Bidding Procedures at an Auction, it will be fair and reasonable as contemplated by Bankruptcy Code section 363. *See, e.g.*, *Abbotts Dairies*, 788 F.2d at 149 (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re Nat'l Health & Safety Corp.*, 1999 WL 703208, at *2 (Bankr. E.D. Pa. Sept. 2, 1999) (citing *Abbotts Dairies* for the proposition that an auction may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

**D.**     *The Proposed Sale Has Been Negotiated at Arm's Length and in Good Faith*

26.     The "good faith" prong of the *Abbotts Dairies* standard also is satisfied. The Debtors request that the Court find that the Stalking Horse Purchaser or the Successful Bidder, as applicable, is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the Sale. Bankruptcy Code section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

27.    Bankruptcy Code section 363(m) thus protects the buyer of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, Bankruptcy Code section 363(m) applies to sales of interests in tangible assets, such as the Acquired Assets.

28.    The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Asset Purchase Agreement was an arm's-length transaction, in which the Stalking Horse Purchaser or Successful Bidder, as applicable, acted in good faith.  The Debtors and the Stalking Horse Purchaser negotiated the Asset Purchase Agreement in good faith and without collusion or fraud of any kind.  The Stalking Horse Purchaser has not engaged in collusion or any conduct that would otherwise control or tend to control the sale price as between or among potential bidders.  The Bidding Procedures are designed to maximize rather than chill competitive bidding and the Auction promotes an open and competitive sale process.  The Debtors have had their own separate legal counsel in negotiations over the Asset Purchase Agreement and will have their own separate legal counsel to negotiate on their behalf throughout the Auction and the Sale.  Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Successful Bidder, including, if applicable, the Stalking Horse Purchaser has purchased the Acquired Assets in good faith within the meaning of Bankruptcy Code section 363(m).

E.    ***All Pertinent Information Regarding The Proposed Sale Has Been Fully Disclosed***

29.    The Debtors have presented the proposed asset Sale openly and in good faith.  The Stalking Horse Purchaser's identity and affiliation with the Debtors has been fully disclosed in this and other pleadings filed with this Court.  The Debtors have fully disclosed and requested the Court's approval of all of the terms and conditions of the proposed Sale.  Sufficient and

adequate notice of this Motion has been provided to interested parties and such parties will receive further notice of the Sale and all relevant dates and deadlines related thereto through the Court-approved Sale Notice.

30.      The Debtors will be prepared to introduce evidence at the Sale Hearing regarding the arm's-length, good faith nature of the Auction and the negotiation of the Asset Purchase Agreement.  Indeed, the Debtors will be able to demonstrate that the Asset Purchase Agreement with the Stalking Horse Purchaser or the Successful Bidder, as applicable, represents the highest or otherwise best bid available to the Debtors for the Acquired Assets following a robust marketing and competitive bidding process.   Accordingly, the Sale pursuant to the Asset Purchase Agreement has been proposed and fully disclosed in good faith and represents the sound business judgment of the Debtors; and, as such, is entitled to this Court's approval.

## II.      The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f)

31.      Under Bankruptcy Code section 363(f), a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Bankruptcy Code section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

32.     The Sale satisfies the criteria set forth in Bankruptcy Code section 363(f).  The Debtors believe that, at a minimum, it satisfies the second prong of section 363(f) because the Volant Funding and Volant Leasing (lessor under the Volant Leases) consent to the proposed Sale to sell the Acquired Assets free and clear of all Liens, Claims, Encumbrances or Interests. Second, the Debtors submit that holders of any Liens, Claims, Encumbrances, or Interests could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their lien, claim, encumbrance, or interest.

33.     In addition, pursuant to the Bidding Procedures, the Debtors will send the Sale Notice to all of the Notice Parties, including all parties who could potentially assert any Lien, Claim, Encumbrance, or Interest against the Acquired Assets.  Accordingly, the Debtors submit that the Sale of the Acquired Assets free and clear of any Liens, Claims, Encumbrances, and Interests (other than Assumed Liabilities, Permitted Liens and Permitted Exceptions) satisfies the statutory prerequisites of Bankruptcy Code section 363(f).

## III.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

34.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d

Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

35.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

36.     Bankruptcy Code section 365(f) provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

37.     Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Moreover, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor.  This provision provides that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default...;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

38.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources

and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

39.     As set forth in the Asset Purchase Agreement (or as shall be set forth in any Qualified Bid), to the extent any defaults exist under any Assumed Contracts such defaults are required to be cured as required under Bankruptcy Code section 365(b)(1).

40.     Based on information received from the Stalking Horse Purchaser, the Debtors believe that each entity has the financial capability to satisfy any and all obligations it will incur in connection with the Assumed Contracts.  In addition, to be a Qualified Bid, any Qualified Bidder must also establish it has the financial capability to satisfy any and all obligations it will incur in connection with the Assumed Contracts.  Additionally, facts will be further adduced at the Sale Hearing to show the financial credibility of the Stalking Horse Purchaser, or Successful Bidder, as applicable, their experience in the industry and their willingness and ability to perform under the Assumed Contracts.  Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of the Stalking Horse Purchaser, or Successful Bidder, as applicable, to provide adequate assurance of future performance under the Assumed Contracts, as required by Bankruptcy Code section 365(b)(1)(C), the Debtors submit that the Court should authorize the assumption and assignment of the Assumed Contracts by the Debtors, effective upon Closing of the Sale.

41.     Additionally, the Bidding Procedures provide that all of the counterparties to Contracts with the Debtors will be given notice of this Sale Motion and through the Cure Notice will have been provided with notice of the potential assumption and assignment of their Contract and the Debtors' proposed Cure Amounts associated therewith.  Moreover, the designation procedures are an adequate mechanism to assume and/or reject Contract, particularly where, as

here, all Cure Amounts will be paid the Stalking Horse Purchaser, or Successful Bidder, if applicable, at Closing.

42.    Based on the foregoing, the Debtors respectfully submit that the assumption and assignment of the Assumed Contracts satisfies the requirements under Bankruptcy Code section 365(f)(2)(A) and (B).

**IV.    Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate.**

43.    The Debtors seek a waiver of any stay of the effectiveness of the order approving this Sale Motion.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  As set forth above, the relief requested herein is essential to maximize the value of the Debtors' business for the benefit of all creditors and stakeholders.

44.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to Bankruptcy Code section 363 are automatically stayed for fourteen (14) days after entry of the order.  *See* Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. Pro. 6004(g).

45.    Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to Bankruptcy code section 365(f) for fourteen (14) days, unless the court orders otherwise.  *See* Fed. R. Bankr. P. 6006(d).

46.    To preserve the value of the Acquired Assets and limit the costs of administering and preserving such assets, it is critical that the Debtors close the Sale as soon as possible after

all closing conditions have been achieved or waived. Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d)

47.    Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

### NOTICE AND NO PRIOR REQUEST

48.    The Debtors have provided notice of this Sale Motion to the following parties or, in lieu thereof, to their counsel, if known: (i) the U.S. Trustee; (ii) all taxing authorities having jurisdiction over any of the Acquired Assets or equity, including the Internal Revenue Service; (iii) the United States Attorney's office; (iv) all government or regulatory authorities having jurisdiction over the Debtors' business; (v) all persons or entities known to the Debtors that have asserted a lien on, or security interest in, all or any portion of the Acquired Assets or equity; (vi) the Stalking Horse Purchaser and its counsel; (vii) any potential bidders previously identified or otherwise known to the Debtors; (viii) Volant SVI Funding, Inc. and its counsel; and (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

49.    No previous motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court enter an order: (i) approving the Asset Purchase Agreement and authorizing the Sale of the Acquired Assets outside the ordinary course of business, (ii) authorizing the sale of assets free and clear of all Liens, Claims, Encumbrances, and Interests, (iii) authorizing the assumption and assignment or rejection of certain executory contracts and unexpired lease; (iv) authorizing the Debtors to

change their corporate name and the caption of these Chapter 11 Cases; and (v) granting such

other and further relief as the Court deems just and proper.

Dated: January 8, 2018
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Travis J. Ferguson (No. 6029)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mumford@lrclaw.com
      ferguson@lrclaw.com

*Proposed Counsel to the Debtors
and Debtors-in-Possession*